**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| **AMERICAN GENERAL LIFE INSURANCE COMPANY,** | |
| **Plaintiff,** | |
| **v.** | **1:06-cv-0695-WSD** |
| **SCHOENTHAL FAMILY, L.L.C. and LIBERTY ONE FUNDING TRUST,** | |
| **Defendants.** | |

## <u>OPINION AND ORDER</u>

This matter is before the Court on Plaintiff American General Life Insurance Company's ("American") Motion for Summary Judgment [130]. Also before the Court is Defendants' Motion to Exclude Plaintiff's Expert Harold Skipper [132], Defendant's Motion to Exclude Affidavit of Kent Major and Opinion Testimony of Amy Holmwood [137], and American's Motion to Exclude Defendants' Proposed Expert Testimony of Gregory G. Wimmer [125].

## I.    BACKGROUND

The litigation appears, at first, simply to concern whether American is entitled to deny a claim for benefits under a $7 million insurance policy (the "Schoenthal Policy") issued in 2004, insuring the life of Samuel Schoenthal, an 82-year old man.  A careful examination, however, reveals that the Schoenthal Policy was the product of a complicated insurance investment mechanism for which Samuel Schoenthal technically did not qualify, and in which he ultimately retained very little financial interest in the policy that nominally was intended to insure his life.  The heart of this case, however, is the undisputed fact that the application for the Schoenthal Policy contained gross misrepresentations of Samuel Schoenthal's net worth and yearly income.

### A.    The Liberty Program

On September 7, 2004, an application for life insurance was submitted seeking an insurance policy on the life of Samuel Schoenthal.[1]  It is undisputed that Samuel Schoenthal did not seek life insurance simply to provide for his family in the event of his death, or even to settle anticipated estate obligations.  Samuel

---

[1] Prior to this formal application, American issued a "medical only" quote for a $10 million policy on Samuel Schoenthal's life.  The formal application requested only $7 million in coverage.

Schoenthal was solicited to participate in the "Liberty Premium Finance Program" ("Liberty Program"), which, purports to be an estate-planning service for high net-worth individuals.

The Liberty Program involves a maze of related entities. The Liberty Program, to the Court's best understanding, is owned and run by Horizon Trade and Finance, Ltd. ("Horizon"), an Irish company. Horizon initiated the creation of several trusts, including the Liberty One Master Trust and Defendant Liberty One Funding Trust (collectively, the "Liberty Trusts").

Credit Suisse Bank finances the Liberty Program, providing start-up funds with which the Liberty Trusts can purchase annuities and life insurance. Credit Suisse secures the credit it extends to the Liberty Program against the policies and annuities.

The Wells Fargo Delaware Trust Company ("Wells Fargo") is the trustee for the Liberty Trusts. Wells Fargo appears to act at the direction of Horizon and Credit Suisse. Wells Fargo was, among other things, required by either Horizon or Credit Suisse to purchase "contestability insurance" to cover any losses to the Liberty Program if American refused to pay benefits on the Schoenthal Policy.

The contestability insurance policy purchased by Wells Fargo requires it to resist, as it is doing here, any denial of claim benefits.[2]

The Liberty Program appears to operate generally by facilitating financing for annuities and high-value life insurance policies for wealthy elderly individuals. An annuity is used to pay the life insurance premium on behalf of the insured. A portion of the life insurance policy benefits are assigned from the insured to a trust entity that is part of the Liberty Program. In this case, $6.68 million of the $7 million value of the Schoenthal Policy was assigned to the Liberty One Funding Trust. A portion of the benefits remains unassigned, and is paid to the insurance policy beneficiary. In this case, the Schoenthal Family, LLC retains $320,000 in benefits. When the insured dies, the assigned portion of the life insurance proceeds accrues to the Liberty Program, which uses the money to cover the transaction costs of the insurance policy and premium, and apparently retains the remainder.

---

[2] Wells Fargo appears to manage both the Liberty One Funding Trust and Schoenthal Family, LLC, the named Defendants in this case.

It is unclear from the record how Samuel Schoenthal became involved in the Liberty Program.  It appears that his involvement in the Liberty Program was solicited by Horizon, Credit Suisse, or entities or persons acting on their behalf.[3]

B.     The Policy Application Process

The application that resulted in the issuance of the Schoenthal Policy was submitted on September 7, 2004.  The application was solicited by Marc Dovi Faivish ("Faivish") and Nathan Chopp ("Chopp"), individuals working at the direction of independent insurance agent Amy Holmwood ("Holmwood"), president of HK Ventures, Inc. ("HK Ventures").[4]

Holmwood was the "writing agent" for the Schoenthal Policy application.  She filled in the Schoenthal Policy application, including the financial

---

[3]  The existence and structure of the Liberty Program, and Samuel Schoenthal's participation in it, are not facts necessary to the Court's findings and conclusions in this Order.  The Court sets forth its understanding of the Liberty Program merely to provide context helpful to understanding more fully the material events and issues in this case.

[4]  It is unclear from the record whether, and to what extent, HK Ventures is associated with the Liberty Program.  HK Ventures is an American General Master Agent, authorized to sell American policies, use American's marks, names, and logos, and train insurance agents to sell American policies.  Holmwood is licensed and authorized to sell American policies.  HK Ventures also sells insurance issued by various other insurance companies.

representations, using the information solicited from Samuel Schoenthal by Faivish.  Holmwood did not have personal knowledge of the accuracy of the representations in the Schoenthal Policy application, including the financial representations.

The application stated that insurance was being sought for "estate planning" purposes.  The application further stated that Samuel Schoenthal's net worth was $10.7 million and that his annual income was more than $150,000.  The application also contained information about Samuel Schoenthal's age and medical condition.[5] Samuel Schoenthal signed the application containing these representations.

HK Ventures sought third party verification of the financial statements in the application.  HK Ventures accepted as verification a Liberty One Funding Trust questionnaire concerning Samuel Schoenthal's involvement in the Liberty Program.  The questionnaire, also signed by Samuel Schoenthal, confirmed the financial representations in the application.  This questionnaire was not transmitted to American.

---

[5] It is undisputed that the application accurately described Samuel Schoenthal's age and health.

The application also contained an "agent report."  The agent report was, in this case, incomplete, and, to some degree, misleading.  For example, Holmwood stated that she had known Samuel Schoenthal for one year.  Holmwood, in deposition, explained that she meant that Samuel Schoenthal had been "in underwriting" or in her "world" for a year, not that she knew him personally for that length of time.  The agent report also asked a series of questions about the agent's relationship and contacts with the applicant.  Holmwood did not answer these questions.[6]  Based on this application, American issued the Schoenthal Policy in the amount of $7 million.

C.     The Claim Denial

On July 14, 2005, Samuel Schoenthal died, and a claim for benefits was promptly filed.  American conducted a contestable claim investigation, in which it reviewed Schoenthal's application, including the medical and financial information.  The investigation disclosed that the application's statements of net worth and yearly income were grossly misrepresented.  The investigation asserted

---

[6] The Court notes these aspects of the application process for the sake of establishing a complete and contextually sufficient set of facts.  As set forth more fully below, these aspects of the application process do not rise to a level that would compel a conclusion of estoppel nor do they affect other legal conclusions reached in this Opinion.

Samuel Schoenthal's net worth was only about $160,000, not the $10.7 million stated on the application, and his annual income was only about $7200, not the $160,000 stated on the application.  In the substantial briefing in this case, and in specific discussions on the issue of misrepresentation between Defendants and the Court, Defendants have not denied that the application for the Schoenthal Policy drastically misrepresented Samuel Schoenthal's net worth and yearly income.

Sarah Wickes, the claims examiner handling the claim for benefits under the Schoenthal Policy ("Wickes"), requested an underwriting review regarding the materiality of the financial misrepresentations in the Schoenthal Policy application. On March 24, 2006, American denied the claim for benefits under the Schoenthal Policy on the grounds that the application contained material misrepresentations about Samuel Schoenthal's net worth and yearly income.

On that same day, American filed an action for declaratory judgment and interpleader in this Court, seeking a declaration that it is not liable to pay on the claim for the policy amount, rescission of the Schoenthal Policy, and interpleader to settle the disbursement of the refunded premiums to the Liberty One Funding Trust and Schoenthal Family, LLC.  On July 6, 2007, Defendants filed counterclaims for breach of contract and bad faith refusal to pay benefits.

8

On August 10, 2007, American filed a motion for summary judgment, contending that the Court should grant declaratory judgment in its favor and dismiss Defendants' counterclaims.  For the reasons set forth below, the Court grants summary judgment.

## II.   DISCUSSION

### A.   Motions to Exclude Expert Testimony

Federal Rule of Evidence 702 permits expert testimony if "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue . . . ."  The Rule permits expert testimony from witnesses qualified by "knowledge, skill, experience, training, or education . . . ."  Id.

The Court, exercising its gatekeeping role in the admission of expert testimony, must ensure that admitted expert testimony is reliable.  Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 597 (1993).  Standards of strict scientific reliability, such as testability and peer review, do not apply to all forms of expert testimony.  Kuhmo Tire Co. v. Carmichael, 526 U.S. 137, 151 (1999).  Rather, "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable."

9

Id. at 152.  The Court's reliability inquiry may, for example, "focus upon personal knowledge or experience."  Id. at 150.

        1.     *Defendants' Motions to Exclude*

            a.   *Harold Skipper*

Defendants move to exclude American's proposed testimony by Harold Skipper, a professor at Georgia State University ("Skipper").  Defendants argue that Skipper's testimony should be excluded because he is unqualified to testify.  Defendants specifically argue that Skipper is not and has never been an underwriter, does not have specific work experience or knowledge concerning underwriting high-value policies for elderly applicants, engaged in no empirical analysis, did not review other underwriting files, and did not interview any American underwriters in forming his expert opinions in this case.  Defendants also contend that Skipper's testimony should be excluded as inherently unreliable because it is contradictory.

Skipper is qualified to testify as an expert on insurance industry standards, including industry standard underwriting practices.  Skipper has a lengthy and distinguished career as an academic and consultant studying all aspects of the insurance industry, including financial underwriting.

Skipper received a doctoral degree in risk and insurance from the University of Pennsylvania.  He participated in the United States Privacy Protection Study Commission, serving as its Senior Consultant on Insurance.  The Commission addressed all aspects of the use of personal information in insurance, including underwriting aspects.  Skipper participated also in the Privacy Protection Advisory Committee to the National Association of Insurance Commissioners, the only academic invited to do so, and assisted with drafting their model privacy bill. Skipper also served as a consultant to President Carter's Privacy Initiative with the Department of Commerce.  These committees were concerned with the use of personal information in insurance applications, and their inquiry included examining the ways in which the life insurance industry uses financial information, including for underwriting purposes.

Skipper has worked for 30 years as an academic in the risk management and insurance field, teaching graduate level courses on all major categories of insurance operations, including underwriting.  Skipper also accepts paid consulting work on insurance issues, including evaluating high-value life insurance policies, and testifying regarding misrepresentations on policy applications, including financial representations.

Most notably, Skipper authored *Life and Health Insurance*, the leading college textbook on life insurance operations.  The book contains chapters on underwriting, including financial underwriting.  *Life and Health Insurance* is the seminal work in the field of insurance risk management and was, for many years, required reading for programs offering Chartered Life Underwriting and Chartered Financial Consultant certificates, as well as for individuals seeking certification as a Fellow of the Society of Actuaries.

American has established that Skipper, based on his extensive education, research, and experience, is qualified to testify regarding insurance industry standards and general practices, including standards and general practices in the area of financial underwriting.

Defendants argue that Skipper's testimony should be excluded because he admits that he has not reviewed enough documents, underwriting policies, or other information to offer expert testimony on American–or any other insurer's–specific business practices.  American states that Skipper is being offered to testify as an expert only regarding general industry practice in the life insurance field.  He is not, in other words, offered to testify regarding the operations of American or any other particular insurer.  Skipper has reviewed the operative documents at issue in

this case, including the Schoenthal Claim File, the Schoenthal Underwriting File, the Swiss Re Financial Guidelines and selections from the Swiss Re Underwriting Manual, the Schoenthal Policy Contract, and the depositions of American Chief Corporate Underwriter Kent Major and Wickes. The Court finds that Skipper's extensive experience in the insurance industry generally, coupled with his familiarity with the documents and testimony relating to the Schoenthal Policy, qualifies him as to offer expert opinion regarding general insurance industry financial underwriting standards and risk management issues, such as whether a reasonable insurance company, following general industry standards, would issue a policy in circumstances like those in the present case.

The Court finds that Skipper's testimony is not inherently unreliable or contradictory. Skipper opines that an economic rationale underlies financial underwriting, such that insurers "insist that the requested amount of insurance bear a reasonable relationship to the financial loss that the beneficiary would suffer because of the insured's death." (Skipper Expert Report at ¶ 15.) Skipper consistently maintains that financial underwriting is both an art and a science, informed both by actuarial and economic principles and by the experience of the particular underwriter. Skipper's deposition states both that: a) insurers can do as

they please; but b) no insurer would issue $7 million policy to a man whose net worth was less than $200,000 for estate planning purposes.  These statements are not, as Defendants contend, contradictory.  The Court finds them complementary, when taken in the context of Skipper's explanation of the artful nature of financial underwriting, and the logical and economic rationale that underlies it.

> b.   *Amy Holmwood*

Defendants next move to exclude alleged opinion testimony of Holmwood, the writing agent for the Schoenthal Policy application.  Defendants seek to exclude Holmwood's alleged opinion testimony because she was not disclosed as an expert witness and did not submit an expert report in this case.  Defendants specifically seek to exclude Holmwood's statement during deposition that no insurance company would have issued a policy to Samuel Schoenthal based on his actual income and net worth.  American argues that Holmwood's testimony is not opinion testimony, or, alternatively, that it is a permissible lay opinion.[7]

The Court finds that statements regarding general insurance industry practice, and particularly whether any insurance company would have issued the Schoenthal Policy if they had known Samuel Schoenthal's true financial condition,

---

[7]  American does not dispute that, to the extent Holmwood's testimony constitutes expert opinion testimony, it should be excluded.

is opinion testimony.  This testimony is not, as American claims, a mere statement of fact.  It is a response to a hypothetical, the answer to which is necessarily informed by Holmwood's specialized experience and knowledge in the insurance industry.  "[T]he ability to answer hypothetical questions is the essential difference between expert and lay witnesses."  United States v. Henderson, 409 F.3d 1293, 1300 (11th Cir. 2005) (citation and quotation omitted).

Non-expert witnesses may only testify to opinions or inferences which are: "(a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witnesses testimony or a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Federal Rule of Evidence 701.  See also, Henderson, 409 F.3d at 1300.  Rule 701 "prototypically" applies to categories of knowledge such as "the appearance of persons or things, identity, the manner of conduct, competency of a person, degrees or light or darkness, sound, size, weight, distance, and an endless number of items that cannot be described factually in words apart from inferences.  Federal Rule of Evidence 701, Advisory Committee Notes.  Lay witnesses can also testify regarding "particularized knowledge" that a lay witness has "by virtue of his or her position" in a particular business.  Tampa Bay Shipbuilding & Repair Co. v. Cedar

Shipping Co., Ltd., 320 F.3d 1213, 1222 (11th Cir. 2003) (quotation and citation omitted).

Holmwood's opinion is not a "lay opinion." Holmwood's opinions regarding whether any insurance company would have issued the Schoenthal Policy in light of his true financial condition is based on the specialized knowledge she attained during her lengthy career as an insurance agent.[8] Her opinion concerning what any insurance company would do in this case is not a "prototypical" area of lay opinion, nor is it an inference about a particular company's operations drawn from her experience with that particular company. Rather, Holmwood's opinion on this issue is, in substance, a classic hypothetical statement based on specialized expert knowledge. Because Holmwood was not properly disclosed as an expert, the Court excludes from consideration the expert opinion to which Defendants object.

> c.   *Kent Major*

Defendants object to the affidavit of Kent Major, American's Chief Corporate Underwriter, for three reasons: (1) the affidavit contains impermissible expert opinion; (2) portions of the affidavit rely on documents responsive to

---

[8] If this opinion does not come from Holmwood's specialized knowledge, it is unfounded speculation, and thus irrelevant.

Defendants' discovery requests but not produced by American; and (3) the affidavit is inconsistent with Major's prior deposition testimony.   For the reasons set forth below, the Court strikes paragraphs 8-22 of the affidavit, and accompanying exhibits.  The Court considers Major's affidavit only to the extent that he discusses American's business practices.

i.        Expert Opinion

Major's affidavit contains four categories of statements.  Paragraphs 1-5 explain American's underwriting procedures, and the general method and role of financial underwriting in American's business practices.  These paragraphs contain fact testimony within Major's knowledge, and, to the extent that they contain opinions or inferences, the opinions or inferences are specific to American's business practices and come from Major's factual knowledge as an American employee rather than any specialized expert experience or knowledge.  Tampa Bay, 320 F.3d at 1222.

Paragraphs 6-22 discuss specific insurance policy underwriting files for elderly individuals who were issued high-value insurance policies.  These paragraphs factually describe the policy, representations made in the application, and American's underwriting process for that particular policy.  Many of these

paragraphs include Major's opinion that, based on his review of the file at issue, the underwriter adequately considered the finances of the applicant.  These representations are not expert opinions, but come from Major's personal knowledge.  Knowledge of how American conducts underwriting, and what sorts of underwriting inquiry are considered acceptable by American, are within the scope of Major's factual knowledge as Chief Corporate Underwriter.

Major, based on his review of these files, justifies the policy amounts using the ranges he calculated under the Swiss Re guidelines.  The Swiss Re calculation for acceptable policy ranges, as represented to the Court, is a straightforward arithmetic procedure.  (See, e.g., Major Aff. at ¶¶ 8-22.)  Major's application of the Swiss Re guideline calculation to several example underwriting files does not render his lay testimony about the facts of those files "expert" in nature.  See United States v. Hamaker, 455 F.3d 1316, 1331-32 (11th Cir. 2006) (holding that a lay witness could testify to conclusions based on simple arithmetic calculations).  The fact that Major has significant experience and training relevant to the Swiss Re calculations does not make his application of those calculations expert testimony.  Id. (holding that while the witnesses's  expertise and use of computer software may

have made him more efficient at engaging in calculations, his actions were within the capacity of any reasonable lay person).

In paragraphs 23-25, Major discusses the nature and application of the Swiss Re guidelines.  Major specifically discusses the flexible nature of policy amount decisions based on Swiss Re calculations, and the many uncertainties inherent in American's methodology for considering policy applications for older insureds. Major states, "It is considered adequate at American General and throughout the life insurance industry to note in the file what the financial information is and that it is justified." (Major Aff. at ¶ 25.)  These representations are within Major's personal knowledge as they pertain to American.  To the extent that Major offers opinions about what is adequate "throughout the life insurance industry," however, those opinions are based on specialized, expert knowledge and must be excluded. Major's affidavit will be considered by the Court only regarding his knowledge of American's business practices.

Paragraphs 26-29 discuss whether the financial misrepresentations in the Schoenthal application were material.  Major states that, under American's normal underwriting practices, the misrepresentation is material because no justification for the Schoenthal Policy would have existed and no policy would have issued if

the misrepresentation had been known at the time the policy was issued.  The

Court finds this discussion falls within Major's factual knowledge and permissible

lay opinion as an American underwriter.[9]

ii.     Failure to Produce

Defendants next argue that paragraphs 8-22 of the Major Affidavit, and the

exhibits referenced therein, should be stricken due to discovery misconduct by

American.  These paragraphs discuss specific high-value policies issued by

American.  Major discusses each policy, and specifically notes how financial

information submitted in the application was used to determine whether the policy

should be issued, and in what amount.  Defendants contend that they demanded

these underwriting files in discovery, but that they were never produced.

Defendants have submitted several discovery requests for all or substantially

all of American's underwriting files for policies in which the applicant's net worth

or income did not meet American's underwriting standards.  American objected to

these requests.  On October 6, 2006, the Court held a discovery hearing, at which

the parties reached a compromise concerning the acceptable scope of discovery in

_____

[9] These paragraphs also discuss American's decision to deny a claim in a factually similar case.  This discussion, for the same reasons, is permissible lay testimony.

this area.  The parties agreed that American would produce a list of policy

numbers, and Defendants could pick ten at random, for which American would

produce the entire file.  (October 6, 2006 Hearing Tr. at 32-33.)  If, based on those

ten files, Defendants thought further production was justified, they could request it.

(Id.)

      Prior to that compromise, Defendants' counsel expressed concern that any

partial or selective disclosure by American might create unfairness, if American

later sought to rely on unproduced materials to its own advantage.  The Court

asked:

> THE COURT:      You wouldn't do that, would you?  I
> mean, if you produced only the
> applications, you wouldn't come back
> and say, by the way, here is
> something else in the file I don't want
> to produce and now I'm going to use
> it against you?  You would agree to
> be barred from the introduction of that
> evidence, wouldn't you?
>
> MR. DONOVAN: Yes, I would.

(Id. at 31-32.)

      Although the scenario currently before the Court is not the precise situation

discussed at the October 6, 2006, hearing, it is precisely the type of prejudice

Defendants' counsel sought to protect himself against if American were permitted

to make a partial, rather than full, disclosure of their policy documents and

information.  The Court expressed clearly at the October 6, 2006, hearing that if

American were permitted to make a partial disclosure, it would not be permitted to

rely later on undisclosed documents to its own advantage.  That is precisely what

American seeks to do here.  The Court therefore strikes paragraphs 8-22 of the

Major Affidavit and the accompanying exhibits.[10]

---

[10]  Defendants last argue that paragraphs 8 and 25 of Major's affidavit should be stricken as inconsistent with his deposition testimony.  The Court has already stricken paragraph 8.

In paragraph 25, Major states that "it would not be common for any underwriter for any company" to state in detail the steps and result of the Swiss Re calculation.  In his deposition testimony, however, Major stated that American "typically required" underwriters to include information in the financial underwriting notes generated by the calculator.

Defendants' observation goes to the weight of Major's testimony on this issue, not its admissibility.  Because an inconsistency exists between the affidavit and the deposition testimony, the Court could not, for example, find that the affidavit created a genuine issue of fact.  See Van T. Junkins and Assoc., Inc. v. United States Industries, Inc., 736 F.2d 656, 658 (11th Cir. 1984).  If American were attempting to overcome summary judgment by creating a genuine issue of fact, striking the inconsistent portions of the affidavit would be appropriate. Huddleston v. R.J. Reynolds Tobacco Co., 66 F.Supp. 2d 1370, 1372-73 (N.D. Ga. 1999).  American, however, is moving for summary judgment, and seeks to show that no genuine issue of fact exists.  The Court can observe that the affidavit and deposition, taken together, do not establish an undisputed fact to the extent that they contradict each other.  Striking the affidavit is not required.  The Court notes, as set forth below, that it does not rely on paragraph 25 to reach its conclusion.

3.   <u>American's Motion to Exclude Greg Wimmer</u>

American moves to exclude the proposed expert testimony of Defendants'

expert Gregory G. Wimmer ("Wimmer") on the grounds that Wimmer is not

qualified to testify as an expert, his testimony is unreliable, irrelevant, or unhelpful,

and that he was not timely designated as an expert.

Local Rule 26.2(C) provides:

> Any party who desires to use the testimony of an expert
> witness shall designate the expert sufficiently early in the
> discovery period to permit the opposing party the
> opportunity to depose the expert and, if desired, to name
> its own expert witness sufficiently in advance of the close
> of discovery so that a similar discovery deposition of the
> second expert might also be conducted prior to the close
> of discovery.  Any party who does not comply with the
> provisions of the foregoing paragraph shall not be
> permitted to offer the testimony of the party's expert,
> unless expressly authorized by court order based upon a
> showing that the failure to comply was justified.

The discovery period in this case ended on July 2, 2007.  Defendants named

Wimmer as an expert on July 2, 2007, the last day of the discovery period.  This is

a clear violation of the Local Rule.

Defendants argue that their late designation of Wimmer was justified

because they were not able to depose American's expert Skipper until June 29,

2007.[11]  Defendants contend that they did not have adequate time to depose Skipper, decide if they wanted to designate their own expert, and have that expert deposed within the discovery period.  Taking, *arguendo*, Defendants' complaint as true, the proper course would have been to seek a discovery extension from this Court or to otherwise notify the Court of this issue prior to the close of discovery. Defendants instead chose to proceed without notifying the Court of the issues about which it now complains.

Defendants have not offered a sufficient justification for their failure to designate Wimmer as an expert properly and in a timely manner.  Defendants have also not offered a sufficient justification for their failure to request additional time to depose Skipper and designate an expert, or otherwise to apprise the Court of this discovery issue.  The Court therefore excludes his testimony.[12]

B.    <u>Summary Judgment</u>

Summary judgment is appropriate where "the pleadings, discovery and disclosure materials on file, and any affidavits, show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of

---

[11]  American's experts were designated in May of 2007.

[12]  Even if the Court were to consider Wimmer's testimony and report, it would reach the same conclusion in this case.

law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact. Herzog v. Castle Rock Entm't, 193 F.3d 1241, 1246 (11th Cir. 1999).  Once the moving party has met this burden, the non-movant must demonstrate that summary judgment is inappropriate by designating specific facts showing a genuine issue for trial.  Graham v. State Farm Mut. Ins. Co., 193 F.3d 1274, 1282 (11th Cir. 1999). The non-moving party "need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings."  Id.

The Court must view all evidence in the light most favorable to the party opposing the motion and must resolve all reasonable doubts in the non-movant's favor.  United of Omaha Life Ins. Co. v. Sun Life Ins. Co. of Am., 894 F.2d 1555, 1558 (11th Cir. 1990).  "[C]redibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury . . . ." Graham, 193 F.3d at 1282.  "If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial."  Herzog, 193 F.3d at 1246.  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."  Scott v. Harris, 127 S.Ct 1769, 1776 (2007).

1.    <u>Rescission</u>

American argues that summary judgment is required by Georgia's insurance

contract rescission statute, O.C.G.A. § 33-24-7.  That statute provides:

> Misrepresentations, omissions, concealment of facts, and
> incorrect statements shall not prevent a recovery under
> the policy or contract unless:
> (1) Fraudulent;
> (2) Material either to the acceptance of the risk or to the
> hazard assumed by the insurer; or
> (3) The insurer in good faith would either not have issued
> the policy or contract or would not have issued a policy
> or contract in as large an amount or at the premium rate
> as applied for or would not have provided coverage with
> respect to the hazard resulting in the loss if the true facts
> had been known to the insurer as required either by the
> application for the policy or contract or otherwise.

O.C.G.A. § 33-24-7(b).

American is required to prove only that one of these three conditions is met.

See, e.g., Graphic Arts Mut. Ins. Co. v. Pritchett, 469 S.E.2d 199, 202 (Ga. Ct.

App. 1995); Nappier v. Allstate Ins. Co., 766 F.Supp. 1166, 1168 (N.D. Ga.

1991).[13]  American contends that rescission is mandated by each condition.  For the reasons set forth below, the Court finds that summary judgment is appropriate.

a.    *Waiver*

Before the Court can reach the merits of American's arguments under the rescission statute, it must address whether American has waived its right to seek the remedy of rescission.  Defendants argue American waived any rescission claim because it has not yet refunded the premium amounts for the Schoenthal Policy.

Under Georgia law, a party alleging fraudulent inducement to enter into a contract must elect the remedy they seek at the beginning of the proceedings, and either: "(1) affirm the contract and sue for damages from the fraud or breach; or (2) promptly rescind the contract and sue in tort for fraud." Megel v. Donaldson, –S.E.2d–, 2007 WL 4126886, *4 (Ga. Ct. App., November 21, 2007) (citation and quotation omitted).  If the party takes any action inconsistent with repudiation of the transaction, they cannot rescind the contract.  Liberty v. Storage Trust

---

[13]  Defendants argue that the rescission clause of the Policy, which permits American to rescind based on misrepresentations on which it relied, controls. Georgia law, however, suggests that O.C.G.A. § 33-24-7 establishes an independent basis for rescission that is not limited by specific language in the policy.  See, e.g., T.J. Blake Trucking, Inc. v. Alea London, Ltd., 643 S.E.2d 762, 763 (Ga. Ct. App. 2007) (refusing to consider a policy rescission clause that required materiality when O.C.G.A. § 33-24-7 was the court's authority for granting summary judgment of rescission).

Properties, L.P., 600 S.E.2d 841, 846 (Ga. Ct. App. 2004).  A party seeking

rescission must "restore, or offer to restore, the consideration received, *as a*

*condition precedent to bringing the action* . . . ."  Nexus Servs., Inc. v.

Manning Tronics, Inc., 410 S.E.2d 810, 811 (Ga. Ct. App. 1991) (emphasis in

original) (citation and quotation omitted).  Actual restoration of the premiums is

not a prerequisite, so long as the insurer acts promptly to rescind the contract and

does not treat it as valid and enforceable.  Lively v. Southern Heritage Ins. Co., 568

S.E.2d 98, 100-101 (Ga. Ct. App. 2002).

     American's original complaint in this action included a count for

interpleader of the premium amount.  This constitutes an offer to restore the

premium amounts.  It also demonstrates American's intent, expressed since the

inception of this case, to seek rescission of the Schoenthal Policy.  American

moved to tender the premium amount to the Court's registry concurrently with

filing its complaint, and has tendered the premium amounts into the registry.

American's actions have not been inconsistent with an intent to rescind the

contract.  American has not waived its right to pursue rescission as a remedy.

The Court next considers whether § 33-24-7 entitles American to rescission as a matter of law.  American's strongest argument relies on § 33-24-7(b)(2), and so the Court begins by addressing that section of the statute.

b.     *Material to the Acceptance of the Risk*

An insurer can rescind an insurance contract if the insured made a misrepresentation "[m]aterial either to the acceptance of the risk or to the hazard assumed by the insurer."  O.C.G.A. § 33-24-7(b)(2).  To avoid the insurance contract under this prong of the statute, "the insurer must show that the representation was false and that it was material in that it changed the nature, extent, or character of the risk."  Lively, 568 S.E.2d at 100.  A material misrepresentation is "one that would influence a *prudent insurer* in determining whether or not to accept the risk, or in fixing a different amount of premium in the event of such acceptance."  Id.  This standard is objective.  See Woods v. Independent Fire Ins. Co., 749 F.2d 1493, 1497 (11th Cir. 1985). "Rather than inquire into what a particular insurer would have done had it known of the insured's misrepresentation . . . Georgia courts employ a reasonableness test, an objective standard of conduct against which to measure the effect of the injured's false declarations."  Id.  The issue of materiality "is ordinarily a question for the

29

jury, unless the evidence excludes every reasonable inference except that it was material, in which case it becomes a question of law for the court." Lively, 568 S.E.2d at 100.

No genuine issue of fact exists that would contradict the common-sense conclusion that the financial misrepresentations in the Schoenthal Policy application would have influenced a prudent insurer, and that a prudent insurer would not have issued a $7 million policy for estate planning purposes to an individual with a net worth of less than $160,000 and a yearly income of $7200.

Defendants have throughout this litigation held up the Swiss Re Underwriting Guidelines, which American purports to use, as a model of reasonable insurance practices, and has criticized American's alleged failure to follow them in underwriting the Schoenthal Policy. Those Guidelines state that for "estate planning" insurance, coverage is justified only when an estate planning need exists; that is, when the estate will owe taxes or other obligations that would be paid by the benefits of the policy. It is undisputed that Schoenthal's actual estate was not subject to tax or mortgage obligations that would justify a $7 million policy amount. Dr. Harold Skipper, American's expert on the issue of general industry standards and practices, has testified that no reasonable insurance

company would have issued the Schoenthal Policy if Samuel Schoenthal's true

financial condition had been known.  This testimony is uncontroverted.[14]

Defendants have not raised an issue of fact on whether a prudent insurer

would have issued the Schoenthal Policy had the true facts of his financial

condition been known.  The evidence before the Court permits a single conclusion:

that the financial misrepresentations would have been material to a prudent

---

[14] Although the Court has excluded the testimony of Defendants' expert Gregory Wimmer, that testimony, even if considered, would not raise an issue of fact on this issue. Wimmer states that he would be "hard-pressed" to find any company that would underwrite a $7 million policy for an individual of Schoenthal's advanced age and low net worth.  (Wimmer Dep. at 106-115.) Wimmer states that the prudence of issuing such a policy would be very fact specific, and would hinge on the premium financing arrangement. (Id.)  He stated that he simply couldn't say whether any specific company would or would not issue such a policy, and that he needed a detailed knowledge of the facts, including the financing arrangement, to determine whether any such policy would be prudent to issue. (Id. at 108-09.)  Wimmer's testimony necessarily suggests that a prudent insurer examining an application for a policy like the Schoenthal Policy would care a great deal about possessing accurate, detailed facts, including the insured's financial condition.

Wimmer's report emphasizes at length the importance of financial underwriting guidelines, which he states are "supposed to be followed in the underwriting of life insurance applications."  (Wimmer Expert Rep. at 12.)  These guidelines advise insurers to obtain accurate financial information.  Wimmer's report leads inescapably to the conclusion that financial information would be material to a prudent insurer.

insurer.[15]  A rational juror could not, on this record, conclude that the

misrepresentations in the Schoenthal Policy application would not be material to

the risk analysis of a prudent insurer.  Summary judgment on this ground is

appropriate.

Although the Court's finding on § 33-24-7(b)(2) is dispositive, the Court

will, for the sake of analytical completeness, consider the other grounds for relief

available under the statute.  After carefully reviewing the record in this case, the

Court finds that, although a close call, summary judgment is not appropriate under

§§ 33-24-7(b)(1) or (b)(3).

c.    *Other Grounds for Rescission*

Section 33-24-7(b)(1) permits rescission if the policy application contains a

"fraudulent" misrepresentation.  American has failed to show as a matter of law

that the misrepresentations in the Schoenthal Policy were fraudulent.[16]

─────────────────────

[15]  Further evidence of the objective materiality of financial
misrepresentations to a prudent insurer is found in the Liberty Program's
guidelines.  The Liberty Program states that applicants have a net worth of at least
$5,000,000.  Defendants' 30(b)(6) witness, in deposition, admitted that Samuel
Schoenthal should never have been a candidate for the Liberty Program based on
his true financial condition

[16]  Defendants argue that American has not pled fraud with sufficient
particularity to assert this prong of the statute.  After carefully reviewing the
complaint, the Court disagrees.  American alleges the who, what, when, and where

Under Georgia law, justifiable reliance is a *prima facie* element of fraud.

Bassett v. Jasper Banking Co., 629 S.E.2d 434, 436 (Ga. Ct. App. 2006).[17]

Defendants contend that American did not justifiably rely on the financial

misrepresentations in the application in its decision to issue the Schoenthal Policy.

To show justifiable reliance, a party "must have exercised due diligence to

discover the fraud perpetrated against him . . . ." Delk v. Tom Peterson Realtors,

Inc., 469 S.E.2d 741, 742 (Ga. Ct. App. 1996). "Ignorance of a fact, due to

negligence, shall be equivalent to knowledge, in fixing the rights of the parties."

Id. A party that relies on a representation without due diligence does not do so

reasonably for the purposes of the fraud analysis. Id.; Lester v. Bird, 408 S.E.2d

147, 150-51 (Ga. Ct. App. 1991).

_____

of the allegedly fraudulent misrepresentation adequately to support a fraud
contention. See Brooks v. Blue Cross & Blue Shield of Fla., Inc., 116 F.3d 1364,
1371 (11th Cir. 1997).

[17] The cases relied upon by American for the proposition that the "fraud"
portion of O.C.G.A. § 33-24-7 does not require justifiable reliance were decided
prior to the enactment of the statute. The parties do not cite, and the Court has not
found, any recent cases addressing the elements of "fraud" for the purposes of the
rescission statute. Where a legislature "borrows terms of art in which are
accumulated the legal tradition and meaning of centuries of practice," such as
fraud, it "presumably knows and adopts the cluster of ideas that were attached to
each borrowed word . . . and the meaning its use will convey to the judicial mind
unless otherwise instructed." Morissette v. United States, 342 U.S. 246, 250
(1952).

An issue of fact exists regarding whether American exercised due diligence with respect to the Schoenthal Policy application's financial representations. The Swiss Re Underwriting Guidelines, which American purports to follow, call for special attention to the circumstances of older-age applicants. It is undisputed that American did not take any steps to verify Schoenthal's financial condition, even those suggested in its own inspection report requirements, such as estate planning documents, verified financial information, or conducting a credit check. Samuel Schoenthal failed to complete a financial questionnaire included with the application. The financial questionnaire asked for detailed information, not inquired after elsewhere in the application, concerning the applicant's income, net worth, and justification for seeking the policy. Samuel Schoenthal left this portion of the application blank, and American did not require him to complete it before issuing the Policy. American relied exclusively on the word of Holmwood, who relied on Faivish, who, apparently, relied on the Liberty One Program, for the proposition that Samuel Schoenthal was a high net-worth individual.[18] American

---

[18] As Defendants note, American seemed content to leave Samuel Schoenthal's financial condition largely unexamined once it learned that his premiums would be financed by the Liberty Program. The Court finds it difficult to believe that Samuel Schoenthal's application would have been granted with a similar lack of scrutiny if he had submitted it on his own behalf.

did not seek a credit check, bank statement, or any other verification of Samuel

Schoenthal's financial status.

Making all inferences in Defendants' favor, as the Court must, an issue of

fact exists regarding whether American reasonably relied on the financial

misrepresentations.[19]

Section 33-24-7(b)(3) permits rescission if "[t]he insurer in good faith would

either not have issued the policy or contract or would not have issued a policy or

contract in as large an amount . . . if the true facts had been known to the insurer as

required either by the application for the policy or contract or otherwise." Id.

Under Georgia law, "the uncontradicted affidavit of the insurer that it would

not have issued the policy in question had it known the truth regarding the

insured's condition precludes any genuine issue of fact with respect to whether the

insurer in good faith would not have issued the policy." Graphic Arts Mut., 469

---

[19] American had no affirmative duty to investigate the truth of Schoenthal's representations before issuing the Schoenthal Policy. Graphic Arts Mut. Ins. Co. v. Pritchett, 469 S.E. 2d 199, 202 (Ga. Ct. App. 1995). The absence of a legal duty to investigate, however, does not mean that American is immune to the  consequences of its decision not to investigate. "Of course, [the insurer] assumes a risk" by failing to investigate, "because recovery on policies issues on such representations is prevent only in the three instances in the statute.  The burden on the insurer is to prove one of them." Id. By failing to investigate Schoenthal's financial status, American has hindered its ability to prove that no genuine issue of fact exists on the elements of fraud.

S.E.2d at 202.  Major's affidavit states that American would not have issued the Schoenthal Policy had the true facts of his financial condition been known. Major's affidavit, however, is contradicted by his deposition testimony on the issue of the importance and role of financial information and financial underwriting in issuing the Schoenthal Policy.  Major articulated a substantially different and higher standard for financial underwriting during his deposition than he did in his later affidavit.  Although Major's statement concerning what American would have done had it known Schoenthal's financial condition is categorical, the discrepancy between that statement and his earlier deposition testimony makes it inappropriate, although barely for the Court to grant summary judgment based on the affidavit. See Van T. Junkins and Assoc., Inc. v. United States Industries, Inc., 736 F.2d 656, 658 (11th Cir. 1984).

      2.    Estoppel

Defendants argue that American is estopped from rescinding the contract based on the negligence and misconduct of Holmwood, Faivish, and Chopp.

In actions related to insurance contracts, "the insurance company is generally considered estopped to deny liability on any matter arising out of the fraud, misconduct, or negligence of an agent of the company.  If either party must

36

suffer from an insurance agent's mistake, it must be the insurance company, his principal." O'Kelly v. Southland Life Ins. Co., 305 S.E.2d 873, 875 (Ga. Ct. App. 1983) (quotation and citation omitted).  "This principle is illustrated by the rule that the insurer is estopped to assert the falsity of answers to questions contained in an application for insurance  . . . where such false answers are inserted by the insurer's agent to whom the applicant for insurance gave correct answers or information . . . ." Stillson v. Prudential Ins. Co. of America, 42 S.E.2d 121, 124 (Ga. 1947).

Defendants attempt to suggest that Holmwood, Faivish, or Chopp either had Samuel Schoenthal sign a blank application which they later filled in with financial misrepresentations, or that Faivish submitted false information to Holmwood after receiving accurate information from Schoenthal.  Although the circumstances of the Schoenthal Policy application are suspicious, Defendants have not raised a genuine issue of fact that would justify estoppel.  An applicant for insurance "is *prima facie* charged with knowledge of the contents of the application signed by him, but this may be rebutted." O'Kelly, 305 S.E. 2d at 874.  There is no evidence in the record that anyone other than Samuel Schoenthal provided the financial misrepresentations.  Defendants have not raised an issue of fact that would rebut

37

the legal presumption that Samuel Schoenthal is, ultimately, responsible for the answers in the application.[20]

Estoppel generally occurs when an applicant provides true answers, and the agent, through fraud or negligence, enters incorrect information on the application. The record in this case shows that Holmwood entered the information provided by Faivish, in reliance on its accuracy. There is no evidence that the information about Schoenthal's income and net worth was not provided by him, or that the information was not on the application when he signed it. Further, Faivish sought to verify Schoenthal's financial information through the Liberty Program questionnaire, which appeared to confirm Schoenthal's high net worth. Estoppel is not appropriate.

    3.    <u>Bad Faith</u>

Determinations of bad faith are generally reserved for the jury at trial. <u>Stegall v. Guardian Life Ins. Co. of Am.</u>, 320 S.E.2d 575, 576 (Ga. Ct. App. 1984).

---

[20] Defendants' argument that some documents were signed in blank by Samuel Schoenthal does not justify estoppel. "Where an application is signed in blank and authority given by applicant to the agent of the company to fill out the application from information given him, any false answers inserted in the application . . . *unless inserted by a misleading device or artifice perpetrated by such agent*, will be binding on the applicant." <u>O'Kelly</u>, 305 S.E. 2d at 875 (citation and quotation omitted). No fact in the record suggests any misleading device or artifice was present here.

Bad faith claims may be resolved as a matter of law, however, if the insurer has a "reasonable and probable cause for refusing to pay the claim." Lancaster v. USAA Cas. Ins. Co., 502 S.E.2d 752, 753 (Ga. Ct. App. 1988). Bad faith claims fail as a matter of law if the insurer has "any reasonable ground to contest the claim" even if there are disputed questions of fact as to the insurer's claim denial. Grange Mut. Cas. Co. v. Law, 479 S.E.2d 357, 359 (Ga. Ct. App. 1996).

The financial misrepresentations in the Schoenthal Policy application were deliberate, drastic, and objectively material to a prudent insurer. The presence of an objectively material misrepresentation constitutes a reasonable ground to contest the claim. As noted above, this misrepresentation is sufficient to provide American with a statutory right to avoid the policy. See O.C.G.A. § 33-24-7(b)(2). American had not only a reasonable ground to contest the claim, but a successful one. Defendants' bad faith claim is dismissed.

4.    Policy

The fundamental premise of Defendants' argument in this case is that they should not be held responsible for the clear and drastic financial misrepresentations in the application because American did not do a good enough job investigating the

truth of the representations.  In essence, Defendants argue that American had an obligation to discover Defendants' deceit.

O.C.G.A. § 33-24-7 embodies a policy judgment by the Georgia legislature that applicants for insurance have an obligation to submit truthful answers.  This obligation is of sufficient importance that insurance companies are entitled to rescind life insurance policies not only based on fraudulent applications, but also on obligations that contain misrepresentations that would be important to that insurer, or even applications that contain misrepresentations important to *any* prudent insurer, regardless of whether the representations were important to the insurer issuing the policy.

Accepting Defendants argument would undermine the policy justification for O.C.G.A. § 33-24-7, essentially reading out the provision that permits rescission based on misrepresentations that would be material to any prudent insurer.  One policy purpose of this clause is to emphasize that even if an insurer fails to investigate information on an application–which it has no legal duty to do –the applicant, and not the insurer, must ordinarily bear the risk of material misrepresentations made to procure insurance.

This is not a case in which one individual lied to an insurer to try to get coverage.  The Liberty Program was a sophisticated, multi-party enterprise designed to profit from the deaths of elderly individuals.  To the extent that the Liberty Program could achieve such profits within the limits of the law, the Court has no objection.  In this case, however, the Liberty Program seeks now to profit from Samuel Schoenthal's life through flagrantly deceitful representations about his financial worth and income.  Without these misrepresentations, Samuel Schoenthal's life would not have generated the payoff Defendants – and their affiliates–seek.

The involvement of the Liberty Program in this case emphasizes the importance of the Georgia legislature's policy decision to allocate the risk of material misrepresentations to the applicant.  If, as Defendants seek to argue, the insurer was responsible for discovering misrepresentation, enterprises like the Liberty Program would be encouraged to submit insurance applications containing material falsehoods, to the extent that doing so results in increased profit.

Life insurance is designed to empower individuals by permitting them to secure their estates and their families against the unknown.  Life insurance provides security, financial certainty, and a measure of comfort in the face of

death.  There are significant policy reasons for striving to ensure that the Liberty Program, and other similar enterprises, restrain their speculation in the area of life insurance to the boundaries permitted by law.  If enterprises like the Liberty Program are permitted to avoid the risks of misrepresentation, misrepresentation becomes an attractive way to reduce the risks inherent in the Liberty Program's business plan.  The Court is not inclined to encourage this behavior.

## IV.    CONCLUSION

**IT IS HEREBY ORDERED** that American General Life Insurance Company's Motion for Summary Judgment [130] is **GRANTED**.

**IT IS FURTHER ORDERED** that  Defendants' Motion to Exclude Plaintiff's Expert Harold Skipper [132] is **DENIED**.  Consistent with American's representations, Skipper's testimony is considered only as to general industry standards and risk management practices.

**IT IS FURTHER ORDERED** that Defendant's Motion to Exclude Affidavit of Kent Major and Opinion Testimony of Amy Holmwood [137] is **GRANTED IN PART** and **DENIED IN PART,** consistent with this Opinion and Order.

**IT IS FURTHER ORDERED** that Plaintiff's Motion to Exclude

Defendants' Proposed Expert Testimony of Gregory G. Wimmer [125] is

**GRANTED**.

**SO ORDERED** this 15th day of January, 2008.

_____
WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE